## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| THROUGH TRANSPORT MUTUAL INSURANCE ASSOCIATION LIMITED,<br><br>      **Plaintiff,**<br><br>      v.<br><br>STARSTONE NATIONAL INSURANCE COMPANY,<br><br>      **Defendant.** | **Case No. 21-2262-JAR-RES** |

## MEMORANDUM AND ORDER

This action involves a coverage dispute between two insurance companies, each claiming that its policy is excess to the other insurer's policy. Before the Court is Defendant StarStone National Insurance Company's ("StarStone") Motion for Summary Judgment (Doc. 26) and Plaintiff Through Transport Mutual Insurance Association, Ltd.'s ("TT Club") Motion for Summary Judgment (Doc. 28). The cross-motions for summary judgment are fully briefed, and the Court is prepared to rule. For the reasons explained below, the Court grants TT Club's motion and denies StarStone's motion.

## I.        Summary Judgment Standard

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine dispute" about "any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the court views the evidence and draws reasonable inferences in the light most favorable to the nonmoving party.[2] To prevail on a motion for summary

---

[1] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could find other than for the moving party."[3]  An issue of fact is "material" if it can "affect the outcome of the suit under the governing law."[4]  And "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party on the issue.'"[5]

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[6]

## II.    Uncontroverted Facts

The following facts and insurance provisions are stipulated by the parties.[7]

### A.    Stipulations of Fact

D&L Transport, LLC ("D&L"), a Kansas limited liability company, was named a defendant in a Texas lawsuit arising out of a 2019 trucking accident.  On the date of the accident, D&L carried three insurance policies that provided coverage for the trucking accident: (1) a "Commercial Insurance Portfolio" issued by Nationwide Mutual Insurance Company ("Nationwide") for the policy period April 1, 2019, to April 1, 2020, which included $1 million in business auto liability coverage; (2) a "Following Form Excess Liability Insurance Policy" issued by StarStone for the policy period April 1, 2019, to April 21, 2020, which provided $5 million in coverage, and specified it was "excess of [the] total limits" of the scheduled followed

---

[3] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[4] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).

[6] *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[7] *See* Doc. 24.

policies;[8] and (3) a "Certificate of Insurance" issued by TT Club for the April 1, 2019, to March 31, 2020, policy period, which included third-party liability coverage with a limit of $5 million per accident, inclusive of defense costs subject to a $5,000 deductible.

D&L gave notice of the Texas lawsuit to its three insurers. D&L tendered its defense to Nationwide and TT Club, which defended the action under a reservation of rights. StarStone did not participate in D&L's defense but was kept abreast of all developments in the case. The Texas lawsuit ultimately settled at mediation for a confidential amount above the Nationwide policy's $1 million limit and within the StarStone policy's $5 million limit.

Before the mediation, TT Club advised Nationwide and StarStone that it believed its policy "provided coverage excess of both the Nationwide and StarStone policies, which functioned as one tower of liability insurance, and that the StarStone excess following form policy was obligated to respond immediately upon the exhaustion of Nationwide's $1,000,000 of coverage."[9] StarStone disagreed, maintaining that its policy was a "true excess" policy that was excess not only to Nationwide's policy but also to TT Club's policy. StarStone thus declined to attend the mediation and refused to pay any portion of the settlement. So, Nationwide and TT Club funded the entire settlement. Nationwide contributed its $1 million limit to the settlement, and TT Club paid the rest of the settlement on a without prejudice basis.

## B.     The Insurance Policies

### 1.     The Nationwide Policy

The Nationwide policy provides general auto-accident liability coverage with limits of $1 million per occurrence and $1 million in the aggregate. The policy states that Nationwide "will

---

[8] *Id.* ¶ 2.b.

[9] *Id.* ¶ 12.

pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'."[10]  Generally, the Nationwide policy insures only "[y]ou for any covered 'auto'" and "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow."[11]  The policy defines "you" as the "Named Insured shown in the Declarations"—here D&L.[12]  The premium for Nationwide's policy was $2,545.

### 2.     The StarStone Policy

The StarStone policy is a "Following Form Excess Liability Policy," meaning its "coverage follows the definitions, terms, conditions, limitations and exclusions of the **Followed Policy** in effect at the inception of this Policy."[13]  The Declarations state that the StarStone policy has limits of $5 million per occurrence and a $5 million aggregate limit, "excess of total limits in **Item 6.** [of the Declarations]."[14]  The premium for StarStone's policy was $3,355.

The "Coverage" section of the policy provides that StarStone "will pay on behalf of the Insured the sums in excess of the Total Limits of Underlying Policies shown in **Item 6.** of the Declarations that the Insured becomes legally obligated to pay as damages."[15]  This section also states that "[t]he amounts [StarStone] will pay for damages is limited as described in **SECTION**

---

[10] Doc. 24-1 at 16.

[11] *Id.*

[12] *Id.* at 15.

[13] Doc. 24-2 at 5.

[14] *Id.* at 3.

[15] *Id.* at 5.

**II. – LIMITS OF LIABILITY**."[16]  Section II, in turn, provides that "[t]his Policy applies only in excess of the Total Limits of Underlying Policies shown in **Item 6.** of the Declarations."[17]

Items 6 and 7 of the Declarations direct the insured to "[s]ee [the] Schedule of Followed Policies and Limits" set out in an endorsement to the policy.[18]  That endorsement, titled "Schedule of Followed Policies and Total Limits of Underlying Policies," amends both items.[19] As set out in the endorsement, Item 7 lists four followed insurance policies—identified by insurance company, policy number, coverage type, policy period, and policy limits—that provide underlying coverage to StarStone's excess policy.[20]  And Item 6 lists the "Total Limits of [the] Underlying Policies" identified in Item 7.[21]  The $1 million Nationwide policy is specifically listed in Items 6 and 7 as one of the four followed insurance policies, but the TT Club policy is not.[22]

The StarStone policy requires D&L "[t]o keep the policies making up the Total Limits of Underlying Policies in **Item 6.** of the Declarations in full force and effect."[23]  If D&L fails to do so, StarStone "will only be liable to the same extent as if there had been full compliance with the[] requirement[]."[24]  The StarStone policy also contains a "Defense" section that provides:

> **A.** We will not be required to assume charge of the investigation of any claim or defense of any suit against an Insured.

---

[16] *Id.*

[17] *Id.* at 6.

[18] *Id.* at 3.

[19] *Id.* at 15.

[20] *Id.*

[21] *Id.*

[22] *See id.*  The other three listed policies and their total limits are not at issue here.

[23] *Id.* at 12.

[24] *Id.*

    **B.** We will have the right, but not the duty, to be associated with an Insured or underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for payment under this Policy.

    **C.** If all Limits of Underlying Policies stated in **Item 6.** of the Declarations are exhausted solely by payment of damages, we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit, which in our opinion may give rise to a payment under this Policy. We may, however, withdraw from the defense of such suit and tender the continued defense to an Insured if our applicable Limit of Liability . . . are exhausted by payment of damages.[25]

Finally, the StarStone policy includes a "Definition" section. In that section, "**Followed Policy**" is defined as "the polic[ies] listed in **Item 7.** of the Declarations of this Policy."[26] "**Underlying Policies**" is defined as "those policies that comprise the Total Limits of Underlying Policies scheduled in **Item 6.** of the Declarations of this Policy and any other applicable underlying insurance, including any self-insured retentions."[27]

### 3.    The TT Club Policy

The TT Club policy provides primary coverage to D&L for "Third Party Liabilities," among other specified risks. The policy's third-party liability coverage carries a limit of $5 million per accident, subject to a $5,000 deductible. The TT Club policy contains a provision entitled "Double Insurance."[28] That provision reads: "If we and another insurer insure you for the same <u>risk</u>, we will exclude any <u>claim</u> to the extent that it is recoverable from the other insurer, or would be recoverable except for a double insurance exclusion."[29] The policy defines

---

[25] *Id.* at 7.

[26] *Id.* at 10.

[27] *Id.*

[28] Doc. 24-5 at 68.

[29] *Id.*

"risk" as "<u>liability</u>, <u>loss</u>, damage or <u>costs</u>."[30]  The total premium for TT Club's policy was $148,000.

## III.    Discussion

TT Club brings this diversity action against StarStone, seeking equitable contribution for the full amount of the D&L settlement it paid above the $1 million Nationwide covered.  The parties stipulate that the issue on summary judgment is the order in which each company's insurance policy is obligated to fund that amount of the D&L settlement that exceeds Nationwide's $1 million limit of liability.  TT Club maintains that StarStone's policy is triggered immediately upon the exhaustion of the Nationwide limit, entitling it to equitable contribution because the settlement should have never reached its own policy.  StarStone contends that its coverage is triggered only after exhaustion of both the Nationwide $1 million limit and TT Club's $5 million limit; thus, equitable contribution is unwarranted.

As explained below, the Court agrees with TT Club that StarStone's policy attached upon exhaustion of the underlying Nationwide policy's $1 million limit.  Therefore, StarStone is liable for the full amount of the settlement above the $1 million paid by Nationwide.  In reaching this conclusion, the Court begins by reciting Kansas law on insurance contract interpretation, and then considers the different purposes of primary and excess insurance, and the different types of excess insurance.  Next, the Court considers the parties' arguments about whether and how horizontal exhaustion applies in this case.  Because the Court predicts that the Kansas Supreme Court would not apply the horizontal exhaustion rule under the facts of this case, it determines the TT Club policy is excess to both Nationwide and StarStone.  And because TT Club and

---

[30] *Id.* at 109.

StarStone both function as excess insurers in this case, insuring the same level of risk, summary judgment is granted in favor of TT Club on its claims for equitable contribution.

### A.      Kansas Rules of Insurance Contract Interpretation

The parties agree that Kansas law governs in this diversity action since the insurance policies were delivered in Kansas.[31]  Under Kansas law, the interpretation of an insurance policy is, like any other contract, a "matter of law to be determined by the court."[32]  "In construing an insurance policy, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished."[33]  And it is well established that "judicial interpretation should not render any [contract] term meaningless."[34]  Regarding endorsements to an insurance policy, "the endorsement and the policy must be read together.  The policy remains in full force and effect except as altered by the words of the endorsement.  Conversely, the endorsement modifies, to the extent of the endorsement, the terms and conditions of the original insurance contract."[35]

---

[31] *See, e.g.*, *Phila. Indem. Ins. Co. v. Kan. City Home Care, Inc.*, 139 F. Supp. 2d 1194, 1197 (D. Kan. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)) ("A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits."); *Cent. Power Syst. & Servs., Inc. v. Universal Underwriters Ins.*, 319 P.3d 562, 567–68 (Kan. Ct. App. 2014) (explaining that under Kansas law a contract is made in the state where the policy is delivered).

[32] *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1018, 740 (Kan. 1983) (quoting *Mah v. U.S. Fire Ins. Co.*, 545 P.2d 366 (Kan. 1976)).

[33] *Iron Horse Auto, Inc. v. Lititz Mut. Ins. Co.*, 156 P.3d 1221, 1225−26 (Kan. 2007) (citing *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002))..

[34] *LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.*, 146 P.3d 1088, 1095 (Kan. Ct. App. 2006) (first citing *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003); and then citing *Farm Bureau Mut. Ins. Co. v. Horinek*, 660 P.2d 1374, 1378 (Kan. 1983)).

[35] *Thornburg v. Schweitzer*, 240 P.3d 969, 976 (Kan. Ct. App. 2010) (quoting 4 Appleman on Insurance 2d § 20.1 at 153–55 (1998)).

If an insurance policy's language is clear and unambiguous, the court must apply it in "its plain, ordinary, and popular sense."[36]  "An insurance policy is ambiguous when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language."[37]  Put differently, ambiguity arises when "application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning."[38]  An insurance policy is not ambiguous "merely because the parties disagree on the interpretation of the language."[39]  And "[c]ourts should not strain to find an ambiguity where common sense shows there is none."[40]

### B.   Primary and Excess Insurance Policies

Primary and excess insurance policies serve different purposes:

> Primary insurance coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability.  An excess policy is one that provides that the insurer is liable for the excess above and beyond that which may be collected on primary insurance.  In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement.  In such a situation, the various insurance companies are not covering the same risk; rather, they are covering separate and clearly defined layers of risk.  The remote position of an excess insurer thus greatly reduces its chance of exposure to a loss.  This reduced risk is generally reflected in the cost of the excess policy.[41]

---

[36] *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998).

[37] *Marshall*, 73 P.3d at 130.

[38] *Gerdes v. Am. Fam. Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1296 (D. Kan. 2010) (quoting *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 756, 459 (Kan. 1992)).

[39] *Marshall*, 73 P.3d at 130 (citing *Jones v. Reliable Sec. Inc.*, 28 P.3d 1051, 1059 (2001)).

[40] *Id.* (citing *Bugg*, 962 P.2d at 519).

[41] *Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 81 (Kan. 1997) (quoting *Union Indem. Ins. Co. v. Certain Underwriters*, 614 F. Supp. 1015, 1017 (S.D. Tex.1985)).

In discussing the difference between primary and excess insurance coverage, the Kansas Supreme Court has acknowledged that "[p]rimary coverage is much more expensive than excess coverage."[42]

There are different types of excess insurance policies. "True" excess insurance policies "are 'written by design' and are excess to a specific underlying policy. Often such policies are 'follow form' policies, which 'incorporate[] and adopt[] the conditions of the policy of insurance immediately preceding it.'"[43] Sometimes excess coverage is created by operation of "other insurances clauses," which "attempt to control the manner in which each insurer contributes to or share a covered loss."[44] "Other insurance" clauses "purport[] to make an otherwise primary policy excess insurance should another primary policy cover the loss in question."[45] There are three different types of "other insurance" provisions: (1) pro rata, (2) excess, and (3) escape.[46] Excess "other insurance" clauses such as the one in TT Club's policy "provide[] that the insurer's liability will only be in excess of amounts due under other policies."[47]

Therefore, the three insurance policies that provided coverage to D&L for the Texas lawsuit can be classified follows: (1) the Nationwide policy provides first-dollar, primary coverage for auto-accident liability with a $1 million limit; (2) the TT Club policy provides first-

---

[42] *Id.*

[43] *Am Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-cv-349 MCA/LF, 2017 WL 3575882, at *5 (D.N.M. Mar. 31, 2017) (first quoting Scott M. Seaman and Charlene Kittredge, *Excess Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 633, 657 (1997); and then quoting *Rummel v. St. Paul Surplus Lines Ins. Co.*, 1997 NMSC-042, ¶ 12, 945 P.2d 985 (N.M. 1997)).

[44] *Am Auto. Ins. Co.*, 2017 WL 3575882, at *5 (quoting Couch on Insurance § 219:1); *W. Cas. & Sur. Co. v. Trinity Universal Ins. Co. of Kan.*, 764 P.2d 1256, 1259 (Kan. Ct. App. 1988), *opinion adopted,* 775 P.2d 176 (Kan. 1989).

[45] *W. Cas. & Sur. Co.*, 764 P.2d at 1259.

[46] *W. Cas. & Sur. Co. v. Universal Underwriters Ins. Co.*, 657 P.2d 576, 579–80 (Kan. Ct. App. 1983) (explaining that there are three general categories of "other insurance").

[47] *Hennes Erecting Co. v. Nat'l Union Fire Ins. Co.*, 813 F.2d 1074, 1077 (10th Cir. 1987).

dollar, primary coverage with a $5 million limit for third-party liabilities but contains an excess "other insurance" provision; and (3) the StarStone policy is a true excess liability policy with $5 million of coverage "in excess of the Total Limits of" the scheduled underlying policies.

## C.    Horizontal Exhaustion

StarStone argues that under the principle of horizontal exhaustion, its "true excess" policy was never triggered because the Texas lawsuit settled within the limits of the Nationwide and TT Club policies, both of which provided primary coverage.  TT Club responds that StarStone's policy attached when the limits of the specified underlying primary policies were exhausted, regardless of the existence of any other available primary policy.  Thus, TT Club contends, because the specified Nationwide policy was exhausted and no other specified primary policies were at issue, StarStone's policy was triggered before TT Club's.

Despite the paucity of Kansas law on the issue,[48] both sides appear to agree that Kansas law recognizes the principle of horizontal exhaustion to determine allocation where multiple insurance policies apply to the same loss.  Horizontal exhaustion requires "all applicable primary policies to be exhausted before the next layer of coverage may be reached."[49]  There is a split of authority about how horizontal exhaustion applies when there are primary insurance policies that become excess due solely to an "other insurance" clause.  Some courts hold that a primary insurer should not be able to invoke an "other insurance" clause to shift loss to an excess insurer

---

[48] *See Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1131–32 (Kan. 2003) (citing *Mo. Pac. R.R. v. Int'l Ins. Co.*, 679 N.E.2d 801, 809 (Ill. App. Ct. 1997)) (holding that self-insured retentions must be horizontally exhausted before the insured could look to excess insurer for coverage); *Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 81 (Kan. 1997) (quoting *Union Indem. Ins. Co. v. Certain Underwriters*, 614 F. Supp. 1015, 1017 (S.D. Tex.1985)) (explaining in general terms that primary insurance must be exhausted before an excess insurer can be required to contribute to a settlement).

[49] *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 714 F. Supp. 2d 1119 (D. Kan.), *on reconsideration in part*, 748 F. Supp. 2d 1261 (D. Kan. 2010).

that charges a lower premium for insuring a lower risk.[50]  These courts hold that all primary

insurance must be exhausted before reaching a true excess insurance policy, including primary

insurance with an "other insurance" clause.[51]  Another approach holds that both types of excess

policies—true excess and primary policies with "other insurance" clauses—cover the same level

of risk for purposes of horizontal exhaustion.[52]

Some jurisdictions that apply horizontal exhaustion apply an exception if the policy

language warrants it: "If an excess policy states that it is excess over a specifically described

policy and will cover a claim when that specific primary policy is exhausted, such language is

sufficiently clear to overcome the usual presumption that *all* primary coverage must be

exhausted."[53]  In this situation, the "specific excess policy must pay as soon as the limits of the

specified underlying insurance are exhausted."[54]

There is no authority that addresses whether an exception to horizontal exhaustion applies

under Kansas law.  Because this Court is "called upon to interpret state law, [it] must look to

---

[50] *See, e.g.*, *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 219 (Iowa 1992) ("A primary insurance provider cannot hide behind an excess insurance clause in its 'other insurance' provision to require an umbrella insurer to cover liability for its insured. We hold that Farm & City's primary insurance policy must be exhausted before the umbrella policy of LeMars Mutual may be reached for payment of the settlement damages."); ! *Farmers Ins. Exch. v. Fed. Ins. Co.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *9 (D.N.M. Nov. 21, 2011) (collecting cases and characterizing as the majority approach).

[51] *Farmers Ins. Exch. v. Fed. Ins. Co.*, 2011 WL 13116736, at *9 (collecting cases).

[52] *See, e.g.*, *Great Divide Ins. Co. v. Lexington Ins. Co*., 84 N.E.3d 844, 846–51 (Mass. 2017) (collecting cases).

[53] *Cmty. Redevelopment Agency v. Aetna Cas. & Surety Co.*, 57 Cal. Rptr. 2d 755, 761 n.6 (Cal. 1996) (applying California law); *see also, e.g.*, *Mayor & City Council of Balt. v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 115 (Md. Ct. Spec. App. 2002) (applying Maryland law) (adopting the standard in *Community Redevelopment Agency*); *Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 649 N.E. 460, 463 (Ill. Ct. App. 1995) (applying Illinois law); *AMHS Ins. Co. v. Mut. Ins. Co. of Az.*, 258 F.3d 1090, 1099 (9th Cir. 2001) (applying Arizona law); *Vigilant Ins. Co. v. Lincoln Gen. Ins. Co.*, 362 F. App'x 841, 843 (9th Cir. 2010) (applying Nevada law); *Am Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-cv-349 MCA/LF, 2017 WL 3575882, at *5 (D.N.M. Mar. 31, 2017) (applying New Mexico law).

[54] *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of the State of Pennsylvania*, No. 15-CV-02744-LHK, 2017 WL 897437, at *14 (N.D. Cal. Mar. 7, 2017) (quoting *Flintkote Co. v. Gen. Acc. Assur. Co. of Canada*, No. C04-01827 MHP, 2008 WL 3270922, at *19 (N.D. Cal. Aug. 6, 2008)).

rulings of the highest state court" to guide its interpretation.[55]  Since the Kansas Supreme Court

has not addressed this issue, the Court must predict how it would rule after giving "proper regard

to relevant rulings of other courts of the State."[56]  The Court "may also consider 'appellate

decisions in other states with similar legal principles . . . and the general weight and trend of

authority in the relevant area of law.'"[57]

### 1.     Kansas Law Supports Applying an Exception to Horizontal Exhaustion When Supported by Policy Language

The Court predicts that the Kansas Supreme Court would find that an exception to

horizontal exhaustion applies when dictated by the unambiguous language of the policy or

policies in question.  As stated above, Kansas law directs courts to construe insurance contracts

as a whole and enforce them as written when the policy language is clear and unambiguous.[58]

As Judge Crabtree explained after conducting an extensive survey of case law on the issue of

horizontal exhaustion, whether an exception applies in other jurisdictions largely depends on the

language in the insurance policies.[59]  The Court predicts that the Kansas Supreme Court would

find that the general rule of horizontal exhaustion will not apply when it is clear from the

language of the applicable policy or policies that the parties intended a different result.  The

---

[55] *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007)).

[56] *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 765 (10th Cir. 2019) (quoting *Stickley*, 505 F.3d at 1077).

[57] *Amparan*, 882 F.3d at 947 (omission in original) (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007)).

[58] *See, e.g.*, *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002) (first citing *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998); and then citing *Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 746 (Kan. 1987)).

[59] *Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kan., Inc.*, 491 F. Supp. 3d 929, 957 (D. Kan. 2020).

Court follows the approach of courts in other jurisdictions that allow the general rule of horizontal exhaustion to give way to the parties' intent when supported by the policy language.[60]

To support its argument that the principle of horizontal exhaustion should apply here without exception, StarStone relies on three decisions applying Kansas law: *St. Paul Fire & Marine Insurance Co. v. Medical Protective Co.*,[61] *Atchison, Topeka & Santa Fe Railway Co. v. Stonewall Insurance Co.*,[62] and *Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kan., Inc.*[63]  But the Court finds that this reliance is misplaced.  These three cases had no occasion to address whether horizontal exhaustion should apply when the policy provides excess coverage only over the limits of specified primary policies.  The excess policies at issue in these cases each contained language unambiguously providing that coverage under the policy would be triggered only when all other insurance was exhausted.  And, consistent with Kansas law, all three courts relied on that unambiguous policy language in concluding that horizontal exhaustion should apply.

In *St. Paul Fire & Marine Insurance Co.*, two insurance companies disputed which company had to pay portions of a medical malpractice settlement against a medical clinic and a doctor it employed, Dr. Linhardt.[64]  Medical Protective had issued primary professional liability policies to three of the clinic's doctors, including Dr. Linhardt, and each policy was amended by

---

[60] *See, e.g., Am Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-cv-349 MCA/LF, 2017 WL 3575882, at *5 (D.N.M. Mar. 31, 2017) (collecting cases); *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 714 F. Supp. 2d 1119 (D. Kan.), *on reconsideration in part,* 748 F. Supp. 2d 1261 (D. Kan. 2010); *Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 649 N.E. 460, 463 (Ill. Ct. App. 1995).  *But see, e.g., Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 333 (4th Cir. 2008); *Farmers Ins. Exch. v. Fed. Ins. Co.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *10 (D.N.M. Nov. 21, 2011).

[61] 691 F.2d 468, 470 (10th Cir. 1982) (applying Kansas law).

[62] 71 P.3d 1097 (Kan. 2003).

[63] No. 18-2371-DDC-JPO, 2019 WL 4752051 (D. Kan. Sept. 30, 2019), *reconsideration granted in part on other grounds*, 491 F. Supp. 3d 929 (D. Kan. 2020).

[64] *St. Paul Fire & Marine Ins. Co.*, 691 F.2d at 469.

endorsement to provide primary coverage to the clinic as well.[65]  St. Paul Fire & Marine ("St. Paul") had issued excess liability policies to two of the doctors, but not Dr. Linhardt.[66]  St. Paul argued that its two excess policies were not triggered until all three Medical Protective primary policies were exhausted based on a limits-of-liability provision contained in its policies.[67]  That provision specified that St. Paul would be liable "only for the ultimate net loss in excess of the 'underlying limits' defined as . . . an amount equal to the limit(s) of liability indicated beside underlying policy(ies) listed or insurance described in Schedule A hereof, *plus the applicable limits of any other underlying insurance collectible by the Insured*."[68]  The district court agreed with St. Paul, finding that Medical Protective's primary policies constituted "other underlying insurance collectible by the Insured" under the plain terms of the excess policies, and the Tenth Circuit affirmed.[69]

In *Atchison*, a policyholder sought declarations that about 120 insurance companies that had issued excess liability policies between 1945 and 1986 were required to indemnify it for settlements of several thousand claims and lawsuits.[70]  One issue before the Kansas Supreme Court was "whether [the policyholder] must pay the amount of its self-insured retention in each policy period before looking to coverage under the insurance policies."[71]  The Kansas Supreme Court explained that "excess insurance coverage . . .  generally assumes that there is primary

---

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.* at 469–70 (emphasis added).

[69] *Id.* at 470.

[70] *Atchison, Topeka & Santa Fe Rwy. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1100 (Kan. 2003).

[71] *Id.* at 1118.

insurance coverage,"[72] and observed that the excess policies at issue contained "other insurance" clauses.[73]  The court concluded that self-insured retentions "are 'other insurance' under the policies, and thus primary insurance" that must exhaust before the excess policies were triggered.[74]  The Court explained that, based on the principle that "[a]n excess policy covers the loss over and above that provided by the primary insurance, . . . [the Court could not] ignore the stated terms of the policies, nor the reality of [self-insured retentions] as primary insurance where the expectation and intent is to provide excess coverage."[75]

Most recently, Judge Crabtree in *Bedivere* addressed whether an excess policy with an "other insurance" clause is subject to the principle of horizontal exhaustion under Kansas law.[76]  There, OneBeacon Insurance Company ("OneBeacon") sought a declaratory judgment stating that Blue Cross and Blue Shield of Kansas ("BCBSKS") had to exhaust all primary insurance policies available to it before OneBeacon's excess policy was triggered.[77]  BCBSKS had two primary policies: "(1) a primary Managed Care Organization Errors and Omissions Liability Policy from Allied World, with a $10 million coverage limit ('Allied World E&O Policy'); [and] (2) a primary Healthcare Organizations Directors and Officers Liability Policy from Allied World, with a $15 million coverage limit ('Allied World D&O Policy')."[78]  OneBeacon's excess policy listed only the Allied World E&O Policy as the scheduled underlying insurance, from

---

[72] *Id.* at 1131.

[73] *Id.* at 1127–28.

[74] *Id.* at 1134.

[75] *Id.*

[76] *See Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kan., Inc.*, No. 18-2371-DDC-JPO, 2019 WL 4752051 (D. Kan. Sept. 30, 2019), *reconsideration granted in part on other grounds*, 491 F. Supp. 3d 929 (D. Kan. 2020).

[77] *Id.* at *3.

[78] *Id.* at *2.

which it followed form.  But, by following form, the OneBeacon excess policy also contained an "other insurance" clause that provided its coverage would be "excess of" and "not contribute with . . . any other insurance . . . (whether collectible or not)."[79]  Relying on that "other insurance" clause, OneBeacon argued that its coverage was not triggered until BCBSKS exhausted all "other insurance," including the Allied World D&O policy.[80]

Judge Crabtree predicted that Kansas would apply the general principle of horizontal exhaustion, "requiring exhaustion of all primary insurance before an excess policy *with an 'other insurance' clause like OneBeacon's* is required to provide coverage."[81]  The court pointed to *Associated Wholesale Grocers, Inc. v. Americold Corp.*, where the Kansas Supreme Court considered whether an excess insurer had raised a material issue of fact when it argued that it was not obligated to provide coverage based on its policy's "other insurance" clause.[82]  In that clause, the scheduled underlying policy's limit had been exhausted.  But the policy had an "other insurance" clause stating that "[i]f other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will NOT make any payments until the other insurance has been used up."[83]  The term "other insurance" was defined as "[i]nsurance other than Scheduled Underlying Insurance or insurance specifically purchased to be excess of this policy affording coverage that this policy also affords."[84]  The excess insurer argued that its policy's coverage was not triggered until certain other primary policies provided coverage, even

---

[79] *Id.* at *4.

[80] *Id.* at *14.

[81] *Id.* at *18 (emphasis added).

[82] 934 P.2d 65, 80 (Kan. 1997).

[83] *Id.*

[84] *Id.*

though they were not scheduled in its policy.[85]  But the Kansas Supreme Court found that the primary policies would not apply under the events causing the loss, so it concluded that the excess insurer had "not shown the existence of any valid coverage" under the primary policies.[86] The Court therefore affirmed summary judgment against the excess insurer.[87]  Based on this case, and the Kansas Supreme Court's decision in *Atchison*, Judge Crabtree predicted that Kansas would require horizontal exhaustion when an excess policy contains an "other insurance" clause.[88]

These cases stand for the proposition that when an excess policy contains language— whether in an "other insurance" clause or elsewhere—stating that it will not provide coverage until all primary insurance is exhausted, Kansas will enforce the policy as written and require horizontal exhaustion.  However, when the excess policy specifies that it will provide coverage when the limits of a specifically identified policy are exhausted, Kansas will enforce the policy as written and find that the unambiguous policy language overcomes the general presumption of horizontal exhaustion.  The Court therefore predicts that under Kansas law, a specific excess policy is triggered immediately upon the exhaustion of the limits of the specific underlying primary insurance policy where there is no language in the policy that dictates a contrary result.

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] On reconsideration, Judge Crabtree found no clear error on this point, but advised BCBSKS that it "may raise its arguments that OneBeacon's obligations to BCBSKS are triggered only when the Allied World E&O Policy is exhausted in a later motion with the additional legal support it now uses to try to make a stronger argument. . . . But, a motion to reconsider is not appropriate for the ambitious result BCBSKS seeks."  491 F. Supp. 3d 929, 975 (D. Kan. 2020).

### 2.    Interpretation of the StarStone Policy

StarStone's contention that its policy "is an excess policy that will not apply until all available primary coverage is exhausted," is not supported by the language of the policy.[89]  On the first page of the StarStone policy, the Declarations state that StarStone provides D&L with $5 million in coverage, "Excess of Total Limits in **Item 6.**"[90]  The policy goes on to state in the "Coverage" section that StarStone will pay "the sums in excess of the Total Limits of Underlying Policies shown in **Item 6.** of the Declarations."[91]  The "Limits of Liability" section then reiterates that "[t]his Policy applies only in excess of the Total Limits of Underlying Policies shown in **Item 6.** of the Declarations."[92]  As described above, Item 6 of the Declarations refers to the "Schedule of Followed Policies and Total Limits of Underlying Policies" in an endorsement to the policy.  As amended by the endorsement, Item 6 lists the limits of the four scheduled policies.  Under Kansas law, the Court must read the endorsement together with the provisions of the original insurance contract.  When doing so, the Court does not find it to be ambiguous—the Item 6 list includes the Nationwide policy's $1 million limit, but not the TT Club policy.  The plain meaning of these provisions indicates that the StarStone policy is a specific excess policy that requires exhaustion only of the limits of the scheduled underlying policies.

The StarStone policy does not contain an "other insurance" clause (or any other similar provision), which distinguishes this case from *Atchison*, *Bedivere*, and *Americold*, where the excess policies provided coverage only after all other policies were exhausted.[93]  The plain

---

[89] Doc. 27 at 25.

[90] Doc. 24-2 at 3.

[91] *Id.* at 5

[92] *Id.* at 6.

[93] *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of the State of Pa.*, No. 15-CV-02744-LHK, 2017 WL 897437, at *16–18 (N.D. Cal. Mar. 7, 2017) ("Even where a specific underlying policy is listed, other provisions in the policies such as the 'other insurance' provision may indicate that the policy remains a general

language of StarStone policy, when construed as a whole, demonstrates that the parties intended to overcome the presumption in favor of horizontal exhaustion.

StarStone tries to avoid this conclusion by pointing to the policy's definition of "Underlying Policies."  The "Definitions" section of the policy states that "**Underlying Policies** means those policies that comprise the Total Limits of Underlying Policies scheduled in **Item 6.** of the Declarations of this Policy *and any other applicable underlying insurance*, including any self-insured retentions."[94]  StarStone contends that this defined term appears in both the "Coverage" section and the "Limits of Liability" section, so "the definition of 'Underlying Policies' is incorporated into the provisions that state when StarStone's policy will apply."[95]

The problem with this argument is that neither the "Coverage" section nor the "Limits of Liability" section uses the unrestricted term "Underlying Policies" in defining and limiting coverage.  Instead, both sections plainly state that the StarStone policy provides coverage "in excess of the Total Limits of Underlying Policies *shown in **Item 6.** of the Declarations*."[96]  The Court cannot ignore the language that immediately follows "Total Limits of Underlying Policies."  This language clearly and unambiguously cabins the "Total Limits of Underlying Policies" to which the StarStone policy applies in excess of those shown in Item 6.  If there were

___

excess policy."); *N. Am. Capacity Ins. Co. v. Colony Specialty Ins. Co.*, 273 F. Supp. 3d 711, 716 (S.D. Tex. 2017) (finding that an umbrella policy's "other insurance" clause providing that the policy was "excess over, and shall not contribute with any of the other insurance" established that it was "written as a 'true excess policy'") *Phila. Indem. Ins. Co. v. Emps. Ins. Co. of Wausau*, 703 F. Supp. 2d 41, 50 (D. Me. 2010) (same); *Columbia Cas. Co. v. Fed. Ins. Co.*, No. 13-CV-01014-HSG, 2015 WL 4734704, at *4 (N.D. Cal. Aug. 10, 2015) (same); *Bosco v. Bauermeister*, 571 N.W.2d 509, 514 (Mich. 1997) (same).  *But see, e.g.*, *Flintkote Co. v. Gen. Acc. Assur. Co. of Can.*, No. C04-01827, 2008 WL 3270922, at *25 (N.D. Cal. Aug. 6, 2008) (finding an excess policy that defined its underlying limit to include only specifically scheduled policies was a specific excess policy, even though it contained an "other insurance" clause); *Travelers Cas. & Sur. Co. v. Trans. Ins. Co.*, 122 Cal. App. 4th 949 (2004) (same); *St. Paul Fire & Marine Ins. Co.*, 2017 WL 897437, at *17 (same).

[94] Doc. 24-2 at 10 (emphasis added).

[95] Doc. 36 at 7.

[96] Doc. 24-2 at 5 (emphasis added).

any remaining doubt, Item 6 itself states that its list of limits constitutes the "Total Limits of Underlying Policies."[97]

StarStone asserts that this interpretation renders the definition of "Underlying Policies" in its policy meaningless.  The Court disagrees because this definition does not define the policy's attachment point in its coverage and Limits of Liability sections.  The defined term is used, unrestricted, in other provisions of the policy that are not at issue here.  Thus, its definition is triggered without restriction in those provisions.  But accepting StarStone's interpretation requires ignoring the plain language of the coverage and Limits of Liability sections that govern when its policy is triggered.

If StarStone had intended to provide excess coverage over all primary insurers, it could have said so in its policy.  For instance, StarStone could have simply omitted the language "shown in Item 6. of the Declarations" from its Coverage and Limits of Liability provisions. Had it done so, the policy's plain language would have required, before its coverage was triggered, exhaustion of the total limits of *all* "Underlying Policies," as that term is defined in the policy—that is, not only "those policies that comprise the Total Limits of Underlying Policies scheduled in **Item 6**" but also "any other applicable underlying insurance, including any self-insured retentions."  To construe the policy as urged by StarStone would read out the endorsement and declaration.

Alternatively, as true excess insurers often do, StarStone could have added an "other insurance" clause to its policy that specified its coverage would not be triggered until all other insurance was exhausted.  But StarStone did not do this.  Instead, StarStone made its coverage

---

[97] *Id.* at 15.

excess only to the total limits of the scheduled underlying policies, which includes Nationwide's policy but not TT Club's policy.

Finally, the Court is not persuaded by StarStone's suggestion that the disparity in StarStone's and TT Club's premium amounts is evidence that the parties intended StarStone to be excess to TT Club. To be sure, some of the cases addressing this topic counsel that true excess insurance premiums are typically lower than primary insurance premiums, the idea being that an insured pays more for primary than excess coverage.[98] But a premium disparity alone should not overcome clear policy language demonstrating that an exception to horizontal exhaustion applies, such as the policy language in this case.[99] And the Court notes that here, Nationwide's premium for first-dollar primary insurance was significantly lower than TT Club's premium, and lower than StarStone's true excess premium. The Court has no evidence or stipulations of fact before it that address these discrepancies. In sum, the policies' premium amounts alone do not preclude a finding in this case that the plain language of StarStone's policy was intended to be excess to Nationwide, but not TT Club.

Therefore, the Court concludes that the StarStone policy was triggered when the Nationwide policy's $1 million limit was exhausted.

---

[98] *See, e.g., Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 81 (Kan. 1997) (quoting *Union Indem. Ins. Co. v. Certain Underwriters*, 614 F. Supp. 1015, 1017 (S.D. Tex.1985)); *Am Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-cv-349 MCA/LF, 2017 WL 3575882, at *5 (D.N.M. Mar. 31, 2017) (quoting *Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.*, 85 Cal. Rptr. 627, 639 (Cal. Ct. App. 1999) (explaining that this is one of the reasons behind the approach of some courts that reject efforts to conflate excess policies with primary policies that have "other insurance" provisions).

[99] *See Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kan., Inc.*, 491 F. Supp. 3d 929, 979 (D. Kan. 2020) (explaining that some courts consider premiums relative to risk, among other factors, to determine if horizontal exhaustion applies).

**D.      TT Club's Request for Equitable Contribution**

Having determined that StarStone's excess coverage was immediately triggered by exhaustion of Nationwide's $1 million policy limit, the Court must next determine whether TT Club's request for equitable contribution is appropriate.  "Between insurers, it is generally a prerequisite to enforcing contribution that their policies insure the same risks."[100]  StarStone argues that because its policy is a true excess policy and TT Club's is a primary policy that is excess only by operation of an "other insurance" clause, they do not insure the same risks and therefore equitable contribution is not appropriate.  TT Club responds that its "other insurance" clause made its policy excess to the Nationwide policy here—placing the TT Club and StarStone policies on the same level.  And, TT Club contends, its policy's "other insurance" clause now applies against StarStone's policy, which does not contain an "other insurance" clause.

The Court agrees with TT Club that the policies insure the same risk.  Although TT Club's policy generally provides first-dollar primary coverage, its "other insurance" clause renders it excess in this case.  Under the terms of the TT Club policy, "risk" is defined as "liability, loss, damages or costs."[101]  The StarStone policy follows form to the Nationwide policy, so it incorporates excess coverage as defined by the Nationwide policy: damages for "'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'"[102]  Thus, once the Nationwide policy limit was exhausted, TT Club was on the same level of risk as StarStone—covering loss associated with the Texas lawsuit to the extent it exceeded Nationwide's $1 million policy limit.  TT Club's request for equitable contribution is therefore appropriate.

---

[100] *Am. States Ins. Co. v. Hartford Acc. & Indem. Co.*, 545 P.2d 399, 407 (Kan. 1976).

[101] Doc. 24-5 at 109 (emphases omitted).

[102] Doc. 24-1 at 16.

Moreover, "[o]ther insurance clauses establish priority as to which policy should be exhausted first when there is more than one policy that provides coverage for a loss."[103]  Priority only comes into play when two or more policies provide coverage.[104]  The TT Club and StarStone policies both cover the same loss.  TT Club's policy, however, contains an "other insurance" clause that states it "will exclude any <u>claim</u> to the extent that it is recoverable from the other insurer, or would be recoverable except for a double insurance exclusion."[105]  StarStone's policy does not have an "other insurance" clause.  The Kansas Supreme Court has determined that "other insurance" clauses are "not in violation of public policy, but [are] merely invoked by insurance companies to establish priority as to which policy should be exhausted first in satisfying the liability."[106]

TT Club's "other insurance" clause further supports the Court's determination that StarStone's policy should be exhausted first, requiring StarStone to pay the entire settlement amount above the $1 million contributed by Nationwide.  Accordingly, TT Club's request for

---

[103] *Cain v. Goodville Mut. Cas. Co.*, 108 P.3d 468 (Kan. Ct. App. 2005) (citing *W. Cas. & Surety Co. v. Trinity Universal Ins. Co.,* 764 P.2d 1256 (Kan. Ct. App. 1988)).

[104] *Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kansas, Inc.*, No. 18-2371-DDC-JPO, 2019 WL 4752051, at *21 (D. Kan. Sept. 30, 2019), *reconsideration granted in part on other grounds*, 491 F. Supp. 3d 929 (D. Kan. 2020); *Progressive Nw. Ins. Co. v. Handshumaker*, 662 F. App'x 630, 632 (10th Cir. 2016).

[105] Doc. 24-5 at 68.

[106] *Am Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-cv-349 MCA/LF, 2017 WL 3575882, at *5 (D.N.M. Mar. 31, 2017) (quoting Couch on Insurance § 219:33).

equitable contribution in that amount is granted.[107]  "[T]his result enforces the polic[ies] as written," with StarStone "stand[ing] exactly where it contracted to be."[108]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant StarStone National Insurance Company's ("StarStone") Motion for Summary Judgment (Doc. 26) is **denied** and Plaintiff Through Transport Mutual Insurance Association, Ltd.'s ("TT Club") Motion for Summary Judgment (Doc. 28) is **granted**.

**IT IS SO ORDERED.**

Dated: September 19, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[107] To the extent TT Club is characterized as a primary insurer for purposes of recovery, it would still be entitled to recover under the doctrine of equitable subrogation.  *See Am. Alt. Ins. Corp. v. Hudson Spec. Ins. Co.*, 938 F. Supp. 2d 908, 916 (C.D. Cal. 2013) (explaining that primary insurers may seek equitable subrogation from excess insurers); *see also Nat'l City Mortg. Co. v. Ross*, 117 P.3d 880, 884 (Kan. Ct. App. 2005) ("The doctrine of equitable, or legal, subrogation 'is a creature of equity invented to prevent a failure of justice, and is broad enough to include an instance in which one party is required to pay what is, between them, the debt of another. . . .  [It] is founded upon principles of natural justice.'" (alteration and omission in original) (quoting *U.S. Fid. & Guar. Co. v. First State Bank of Salina*, 494 P.2d 1149, 1157–58 (Kan. 1972)).

[108] *Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 649 N.E.2d 460, 464 (Ill. Ct. App. 1995).